# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **SHAWN ROBINSON,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 3:23cv1208 (MPS)** |
| | : | **consolidated with** |
| | : | **3:23cv1307** |
| | : | |
| **NICK RODRIGUEZ, et al.,** | : | |
| **Defendants.** | : | |

## <u>RULING ON MOTION FOR SUMMARY JUDGMENT</u>

The *pro se* plaintiff, Shawn Robinson, is a sentenced inmate confined at the Connecticut Department of Correction ("DOC") MacDougall-Walker Correctional Institution ("MacDougall").[1] He is proceeding in this civil rights action under 42 U.S.C. § 1983 for damages on claims against Lieutenants Shannon Bowers and Benjy Nichols.[2] *See* Initial Review Order, ECF No. 20.[3] Plaintiff brings claims of Eighth Amendment and Fourteenth Amendment Procedural Due Process Clause violation against both Defendants.[4] *Id.*

Defendants filed a motion for summary judgment with a memorandum of law, Local Rule 56(a)(1) Statement, and supporting exhibits. Mot. for Summ. Judg., ECF No. 47; Defs.'

---

[1] The Court may "take judicial notice of relevant matters of public record." *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012). The Connecticut DOC website reflects Plaintiff was sentenced to fifty-five years of incarceration on September 4, 1987, and that he is now confined at MacDougall. *See* http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=148846 (last visited July 22, 2025).

[2] The declarations of Lieutenant Bowers and Nichols confirm their full names and proper spellings. *See* Defs.' Ex. 3, Nichols Decl., ECF No. 47-3; Defs.' Ex. 4, Bowers Decl., ECF No. 47-4.

[3] The Court granted a motion to dismiss Plaintiff's Eighth Amendment claim against Unit Staff Laghari. *See* Order, ECF No. 44.

[4] Plaintiff's complaint is not verified. *See* Compl., ECF No. 1.

Mem., ECF No. 47-1; Defs.' Local Rule 56(a) ("Defs.' L.R."), ECF No. 47-2; Defs.' Exs., ECF

Nos. 47-3 to 47-11. Plaintiff has responded to Defendants' motion for summary judgment. Pl.'s

Opp., ECF No. 51; Suppl. Opp., ECF No. 56; Pl.'s L.R., ECF No. 57. Defendants have filed both

a reply and a sur-reply. Defs.' Reply, ECF No. 54; Defs.' Sur-reply, ECF No. 63.

     After thoroughly considering the materials submitted by the parties, the Court grants the

motion for summary judgment in Defendants' favor.

## I.    FACTS[5]

---

[5] This factual background reflects the Court's review of the parties Local Rule 56(a) statements of facts and supporting exhibits.

Defendants have informed Plaintiff of the requirements for filing his papers in opposition to the motion for summary judgment under Local Rule 56. Notice, ECF No. 47-12. Local Rule 56(a)1 provides: "Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact." Local Rule 56(a)2 requires that "[a]ll denials must meet the requirements of Local Rule 56(a)3." Local Rule 56(a)3 specifies that "each denial in an opponent's Local Rule 56(a)2 Statement[] must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial."

On February 4, 2025, the Court observed that Plaintiff filed an objection to the motion for summary judgment that listed his arguments but provided no supporting materials or statement of facts in compliance with Local Rule 56(a)2. See Order, ECF No. 55. Thus, the Court construed Plaintiff's motion for the court to suspend court deadlines as a motion for extension of time to file a response to the motion for summary judgment supported by evidence and a statement of facts in compliance with Local Rule 56(a)2. *Id.* The Court afforded Plaintiff an opportunity to do so by February 22, 2025, and advised him to review the Notice to Self-Represented Litigant provided to him with Defendants' motion for summary judgment. *Id.*

On February 26, 2025, Plaintiff filed a response to Defendants' motion for summary judgment, a document entitled "Plaintiff's Response to Local Rule 56(a)2," his own declaration, and declarations from two other inmates. Pl.'s Reply, ECF No. 56; Pl's Response to Local 56(a)2, ECF Nos. 57; Declarations, ECF Nos. 58-60. But he has not filed a statement of facts that complies with Local Rule 56(a). See Pl.'s L.R., ECF No. 57. Thus, the Court will deem a statement of fact in Defendants' Local Rule 56(a)1 statement to be admitted if supported by evidence. *Patterson v. Quiros*, No. 3:19CV147 (MPS), 2021 WL 681144, at *1, n.3 (D. Conn. Feb. 22, 2021).

Plaintiff has been incarcerated since the 1980s. Defs.' L.R. at ¶ 1.[6]

At the time relevant to this action, Shannon Bowers and Benjy Nichols worked as Lieutenants for DOC. *Id.* at ¶¶ 3, 4. In this position, Defendants were responsible for supervising corrections officers, enforcing facility policies and protocols, ensuring that each housing block was adequately staffed, and responding to and managing incidents involving inmates. *Id.* at ¶ 5. At the time relevant to this action, Defendants were stationed at Corrigan-Radgowski Correctional Center ("CRCC"). *Id.* at ¶ 6.

<u>DOC COVID-19 Policy</u>

In September 2020, DOC had a policy for CRCC entitled Inmate COVID-19 Testing Operational Plan ("Testing Policy"). *Id.* at ¶ 7.[7] Defendants were familiar with the Testing Policy as part of their supervisory duties as Lieutenants and assisted in carrying the Policy out at CRCC. *Id.* at ¶ 8. The Testing Policy required CRCC to implement a procedure for testing inmates for COVID-19, consistent with then-existing social distancing guidelines and to designate separate units for housing inmates based on results of those tests (i.e., positive, negative, refusals). *Id.* at ¶ 9. For those inmates housed in the Corrigan Building, the Testing Policy designated the "A-Pod … as the Quarantine Unit." *Id.* at ¶ 10. Any inmates who opted out of testing were housed in the A-Pod for fourteen days. *Id.* New admissions into CRCC were also housed in the A-Pod for fourteen days before they transitioned into general population. *Id.*

---

[6] Where the facts are not disputed, the Court cites only to the Local Rule 56(a)1 statement. For citations to exhibits, the Court cites page numbers assigned by the CM/ECF system as reflected in the ECF header and not the page numbers marked on the documents themselves, if any.

[7] Defendants have submitted a copy of the CRCC Testing Policy in effect as of July 28, 2020. ECF No. 47-9. Under section 5, the Testing Policy provides: "Inmates [who] opt-out of testing will be housed in A-Pod." *Id.*

The Testing Policy required inmates who tested positive—but who were asymptomatic—to be quarantined in a separate unit, while symptomatic positive inmates would be transferred to a different facility. *Id.* at ¶ 11.

<u>Plaintiff's Quarantine in the A-Pod</u>

On September 11, 2020, Plaintiff transferred from Garner Correctional Institution to CRCC. *Id.* at ¶ 12. Thus, Plaintiff was initially housed in A-Pod (Cell A-222). *Id.* at ¶ 13.

On September 11, 2020, Registered Nurse Stephanie Frasier offered to test Plaintiff for COVID-19, but he refused to be tested. *Id.* at ¶ 14.

On September 13, 2023, Nurse Frasier again offered to test Plaintiff for COVID-19, but he again refused to be tested. *Id.* at ¶ 15. In his deposition, Plaintiff explained that he refused to be tested for COVID-19 because he had a "choice" not to take the COVID test and believed it was not right to say he had to take the COVID test. Pl.'s Dep. at 10:25-11:12, ECF No. 47-11.

After his refusal to take the test for COVID-19 infection, Plaintiff was transferred to an Administrative and Processing cell ("A & P Cell") on September 13, 2020, for a quarantine away from the other inmates who were housed in A-Pod. Defs.' L.R. at ¶ 17.

Lieutenant Nichols avers that the A & P Cell was used on several occasions during the pandemic to quarantine inmates who opted out of testing; and that Plaintiff was transferred to the A & P Cell as his COVID-19 infection status was unknown and he needed to be separated from the rest of the A-Pod inmates to avoid further spread of virus. Nichols Decl. at ¶ 17.

Plaintiff recalls that Lieutenants Bowers and Nichols were the supervisors who escorted him to the A & P Cell. Pl.'s Dep. at 6:22-7:15. In his deposition, Plaintiff maintained that Bowers or Nichols had to have made the decision to transfer him to the A & P Cell because they

were the supervisors during his escort, although he was never advised about who made the transfer decision. *Id.* at 6:21-7:15.

Plaintiff was housed in the A & P Cell from September 13 through September 16, 2020. Defs.' L.R. at ¶ 24. During that period, Plaintiff was offered a third COVID-19 test on September 14, 2020. *Id.* He again refused. *Id.*

<u>Conditions During Plaintiff's Three-Day Quarantine in the A & P Cell</u>

The A & P Cell is a larger cell meant to temporarily hold inmates while they are being processed to enter or exit CRCC; and it was used by staff during the pandemic to quarantine inmates. *Id.* at ¶ 18. At the time relevant to his action, CRCC staff moved inmates around the facility to quarantine and to avoid overcrowding in housing units. *Id.* at ¶ 19.

Plaintiff complains that he was deprived of a mattress and meals during his three-day quarantine. Compl. at ¶ 5.[8] Plaintiff admits, however, that he did not complain to either Defendant about the conditions of his A & P Cell. Pl's Dep. at 12:23-13:3.

During his confinement in the A & P Cell from September 13 to September 16, 2020, Plaintiff slept each night on a wooden bench large enough for him to lay down and sleep; specifically, he explained that he was able to "nod off" but it "wasn't comfortable." Defs.' L.R. at ¶ 27; *see* Pl.'s Dep. at 9:17-25. He admits that he did not address his lack of a mattress with any correctional officer during his A & P Cell confinement. *Id.* at 10:4-16.

In his deposition, Plaintiff explains that he was on a no-soy diet while at Northern Correctional Institution and Garner Correctional Institution prior to his transfer to CRCC due to having experienced a bad reaction. Pl.'s Dep. at 13:7-14; 14:5-17. Plaintiff admitted he was

---

[8] Inmates temporarily housed in the A & P Cell were allowed showers but not recreation. Defs.' L.R. at ¶ 21.

delivered three meal trays—breakfast, lunch, and dinner—each day while he was in the A & P
Cell. Pl.'s Dep. at 14:18-25. Plaintiff explained that he refused to accept the meal trays because
he is allergic to soy and had previously received trays labeled "soy free" while at Garner; the
trays delivered to him in the A & P Cell were not labeled "soy free;" and correctional staff told
him that he had received "regular" trays. *Id.* at 13:15-17:1

Plaintiff confirmed that he did not ask any of the correctional staff whether there was soy
in the food on his trays, and he did not look at the trays to determine if any of the food was soy
free—such as fruits or vegetables—prior to rejecting the tray. *Id.* at 16:5-12; 17:2-5; 19:1-7.
Plaintiff agreed that the menu for regular trays includes items that do not contain soy such as
vegetables and fruit, but he did not want to accept a regular tray due to his concern that he would
be taken off of his soy-free diet. *Id.* at 18:24-21:8.[9] He could not identify the correctional officer
who served him the regular trays and advised him that he was "down" for a regular tray. *Id.* at
16:3-6; 17:8-13.

On September 16, 2020, Plaintiff moved from the A & P Cell back to A-Pod at cell A-
112, where he was provided with a mattress. Defs.' L.R. at ¶¶ 37, 41.

Plaintiff recalls he had a conversation with the CRCC Warden after he was moved to A-
Pod. Pl.'s Dep. at 23:20. He claims that he possibly raised his complaint about not being
provided with the soy diet while in the A & P Cell but was not 100% sure. Pl.'s Dep. at 27:13-
22. After speaking with the Warden, Plaintiff received soy-free trays, although his soy diet was
later stopped. *Id.* at 27:20-82:8.

---

[9] When questioned further about his assertion that he would be prevented from receiving a non-soy diet if
he ate non-soy items from a regular tray while quarantined in the A & P Cell, Plaintiff responded "that is
just the way it is. That's what would have happened" and "That's how it operates." *Id.* at 20:21-:22; 21:7-
:8. He provided no other substantiation for this claim.

<u>Lieutenants Bowers and Nichols</u>

Lieutenant Bowers avers that she does not recall Plaintiff's refusal of COVID-19 testing; who made the decision to transfer Plaintiff to the A-Pod; or whether she was involved with moving Plaintiff to the A-Pod. Bowers Decl. at ¶ 11, ECF No. 47-4. Bowers declares her review of the staff rosters shows she worked both a third shift as Desk Lieutenant (which did not involve contact with inmates), and a first shift managing the inmate population on the east side of the Corrigan Building (where A-Pod is located) on September 12, 2020; worked a third shift in the Radgowski Building on September 13, 2020; and did not work any shifts between September 14 and 16, 2020. *Id.* at ¶ 12.

Lieutenant Nichols avers that he cannot recall whether he was involved with moving Plaintiff to the A & P Cell or who made the decision to move Plaintiff to the A & P Cell. Nichols Decl. at ¶ 15. He declares that his review of the staff rosters for CRCC shows that he worked shifts on September 12, 13, and 14, 2020, and was off duty on September 15 and 16, 2020. *Id.* He notes that he was on duty from September 12 to 14, 2020, in the West Side of the Corrigan Building—the opposite side of the building from where A-Pod was—and in the Radgowski Building. *Id.* He explains that the West Side Supervisor is not generally responsible for touring the A & P area, but it was common at the time relevant to this action for the West Side Supervisor to assist officers in other cell blocks with the frequent movement of inmates to quarantine. *Id.*

According to his own testimony, Plaintiff never saw or had any contact with Lieutenant Bowers and Nichols after his escort to the A & P Cell on September 13, 2020. Pl.'s Dep. at 12:23-13:3; 21:11-16.

7

Both Lieutenant Bowers and Nichols aver that CRCC has a policy for each inmate to be provided with a mattress to sleep on; that CRCC can provide portable mattresses for inmates housed in an area without a bed; and that they had no knowledge about whether Plaintiff was provided a mattress for his A & P Cell. Nichols Decl. at ¶ 26; Bowers Decl. at ¶ 22.

As Lieutenants, Defendants are not involved in or responsible for delivering meals to inmates or ensuring that inmates receive special meals to account for food allergies. Defs.' L.R. at ¶ 60. An inmate's medically-related meal plan is handled by CRCC's medical department, which puts an order into the Kitchen Supervisor to prepare appropriate meals for that inmate. *Id.* at ¶ 61.

## II.    STANDARD OF REVIEW

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(a), Fed. R. Civ. P.; *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.,* 875 F.3d 107, 113-14 (2d Cir. 2017). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage*, 875 F.3d at 113-14 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). The moving party bears the initial burden of informing the court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this

8

burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). He cannot "rely on conclusory allegations or unsubstantiated speculation but must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 34 (2d Cir. 2015) (quotation marks and citation omitted). Although the court is required to read a self-represented "party's papers liberally and interpret them to raise the strongest arguments that they suggest," *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015), "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

## III.   DISCUSSION

Defendants argue that Plaintiff cannot prevail as a matter of law on his claims of Eighth Amendment and Fourteenth Amendment procedural due process violation; or in the alternative, Defendants are entitled to qualified immunity from liability.[10] Defs.' Mem. at 1-2, ECF No. 47-1.[11]

As he is seeking monetary damages from Defendants in their individual capacities, Plaintiff must establish their personal involvement in any asserted constitutional violation. *See*

---

[10] Defendants have each asserted exhaustion and qualified immunity as an affirmative defense. Bowers Ans. at 3, ECF No. 34; Nichols Ans. at 3, ECF No. 35.

[11] Defendants also argue that Plaintiff failed to exhaust his administrative remedies in compliance with the Prison Litigation Reform Act ("PLRA"). *Id.* Plaintiff counters that his administrative remedies were unavailable and has submitted his declaration and declarations from two other inmates averring that the necessary grievance forms were not available. *See* Pl.'s Opp. at 1-2, ECF No. 51; Decls., ECF Nos. 58-60. Because the motion for summary judgment may be granted on the merits and qualified immunity, the Court will not address the parties' arguments concerning Plaintiff's PLRA exhaustion.

*Tangreti v. Bachman*, 983 F.3d 609, 620 (2d Cir. 2020) (a plaintiff must "plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability"); *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.").

### A.    Eighth Amendment

The Eighth Amendment, which forbids cruel and unusual punishment, has been interpreted to prohibit conditions in state prisons that subject incarcerated individuals to the "wanton and unnecessary infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). To constitute an Eighth Amendment violation, a condition must be "sufficiently serious" such that it results in a deprivation of "the minimal civilized measure of life's necessities." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citation omitted). Even where a condition meets that high bar, a plaintiff seeking to hold prison officials liable under the Eighth Amendment must also show that in subjecting inmates to the particular condition, "the defendant official acted with a sufficiently culpable state of mind.... such as deliberate indifference to inmate health or safety." *Id.* (citation omitted). Those two requirements—a sufficiently serious condition and a culpable state of mind—are often referred to as the "objective" and "subjective" elements required for stating a plausible Eighth Amendment claim. *See, e.g., Brock v. Wright*, 315 F.3d 158, 162-64 (2d Cir. 2003).

Conditions are objectively serious enough to implicate the Eighth Amendment where, alone or in combination, they produce "deprivation of a single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (noting that "low cell

10

temperature at night combined with a failure to issue blankets" may establish an Eighth

Amendment violation). The Constitution does not permit "inhumane" prisons, but it does not

"mandate comfortable prisons." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citation omitted).

There is no bright-line rule or "static test to determine whether a deprivation is sufficiently

serious; the conditions themselves must be evaluated in light of contemporary standards of

decency." *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012). Also, the length of time an inmate

is subjected to the condition is relevant in determining whether it is sufficiently serious. *See*

*Rhodes*, 452 U.S. at 37 ("the length of confinement cannot be ignored in deciding whether the

confinement meets constitutional standards."). The inquiry focuses on the "severity and

duration" of the condition. *See Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015); *see, e.g.,*

*Hutto v. Finney,* 437 U.S. 678, 686–87 (1978) ("A filthy, overcrowded cell and a diet of "grue"

might be tolerable for a few days and intolerably cruel for weeks or months.").

To meet the subjective element, an inmate must show that the defendants possessed

culpable intent; that is, the defendants knew that he faced a substantial risk to his health or safety

and disregarded that risk by failing to take corrective action. *See Farmer*, 511 U.S. at 834, 837.

The defendants "must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and [they] must also draw the inference." *Id.* at 837.

"[M]ere negligen[t]" conduct is insufficient. *Id.* at 835. Rather, a plaintiff must provide evidence

to support a claim that a defendant knew of and disregarded a serious risk of harm to his health

and wellbeing. *See Tangreti v. Bachman*, 983 F.3d 609, 619 (2d Cir. 2020).

1.    Mattress Deprivation

Because "sleep is critical to human existence," some "conditions that prevent sleep have

11

been held to violate the Eighth Amendment." *Walker*, 717 F.3d at 126. Thus, an unnecessary deprivation of bedding can rise to the level of a constitutional violation. *See Bell v. Luna*, 856 F. Supp. 2d 388, 398 (D. Conn. 2012) (inmate forced to sleep on unsanitary mattress for seven months stated sufficiently serious condition of confinement to implicate Eighth Amendment).

Plaintiff complains that he had to sleep on a wooden bench in the A & P Cell from September 13, 2020 until he was moved to the A-Pod 112 on September 16, 2020. Pl.'s Dep. at 8:12-:23; 9:8-13; Defs.' Ex. 3, Housing History, ECF No. 47-8. He admits that he got to sleep while in the A & P Cell despite his lack of a mattress, although he was uncomfortable. Pl.'s Dep. at 9:14-:25.

Generally, district courts have held that a temporary or limited exposure to a condition does not amount to an Eighth Amendment violation. *White v. Smith*, No. 2021 WL 5989600, at *8 (N.D.N.Y. Oct. 15, 2021); *Beauvoir v. Falco*, 345 F. Supp. 3d 350, 374 (S.D.N.Y. 2018) ("Deprivations of such mild duration and severity do not rise to the level of being considered cruel and unusual treatment under the Constitution."). Likewise, conditions that cause only discomfort but do not pose a serious risk to an inmate's health and safety do not rise to a deprivation of constitutional dimension. *See, e.g. Trammell v. Keane*, 338 F.3d 155, 165 (2d Cir. 2003) ("Deprivation of ... toiletries [other than toilet paper] for approximately two weeks-while perhaps uncomfortable-does not pose such an obvious risk to an inmate's health or safety....")

Here, no evidence suggests that Plaintiff's three-night mattress deprivation was severe or exposed him to any harm beyond temporary discomfort. *Davis v. Chapple,* No. 07–cv–321 (GTS/DRH), 2009 WL 6312502 at *13 (N.D.N.Y. Nov. 4, 2009), *adopted* at, 2010 WL 985763 (N.D.N.Y. Mar.16, 2010) (deprivation of a mattress for three days did not constitute an

objectively serious harm); *Tapp v. Taylor,* No. 05–CV–1442 (LEK/DRH), 2009 WL 2473499 at

*4–*5 (N.D.N.Y. July 16, 2009) (inmate housed naked and without a mattress for five hours did

not constitute an Eighth Amendment violation). During his short period of time without a

mattress, Plaintiff was uncomfortable but did not sustain a serious deprivation of his basic human

need for sleep. Based on the present record, no reasonable finder of fact could determine that

Plaintiff suffered an objectively serious condition based on his three-night mattress deprivation.

Even if Plaintiff's mattress deprivation satisfies the Eighth Amendment's objective

element, no evidence supports an inference that Lieutenants Bowers or Nichols acted with

deliberate indifference to Plaintiff's serious risk of harm. Plaintiff does not dispute that he had no

contact with either Defendant after his escort to the A & P Cell on September 13, 2020, and he

admits that he never made any correctional officer aware of his need for a mattress during the

weekend. Pl.'s Dep. at 10:4-:11; 21:11-16.

No reasonable jury considering the record in this case could determine that Lieutenants

Bowers or Nichols should be liable for an Eighth Amendment violation as a result of Plaintiff's

failure to receive a mattress during his three-day confinement in the A & P Cell.

The Court grants the motion for summary judgment in Defendants' favor on this claim.

2.    Meal Deprivation

"[T]he Eighth Amendment prohibition against cruel and unusual punishment does require

that prisoners be served nutritionally adequate food that is prepared and served under conditions

which do not present an immediate danger to the health and well being of the inmates who

consume it." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (internal quotation and citation

omitted). A "substantial deprivation of food" may rise to a constitutional dimension and satisfy

the objective element. *See id. See also Salgado v. DuBois*, No. 17-CV-6040 (NSR), 2019 WL 1409808, at *10 (S.D.N.Y. Mar. 28, 2019) (for an Eighth Amendment claim, the deprivation of food or nutrients must be enough to create a serious danger to the health of the inmate).

The record reflects that Plaintiff did not suffer a substantial food deprivation. He admitted to rejecting the food trays provided to him because unidentified correctional staff informed him that the trays were for the regular meal plan and not for a no-soy diet. Pl.'s Dep. at 13:15-:15; 14:21-18:25. At the same time, he agreed that the regular meal plan included non-soy food, but he nonetheless never looked to determine whether the meals he rejected included non-soy items that he could safely consume. *Id.* at 19:1-:7. Thus, the record fails to support any genuine issue of fact that Plaintiff was actually deprived of safe and nutritional food. *See Swinton v. Wright*, No. 3:16-CV-659 (SRU), 2017 WL 3880314, at *3 (D. Conn. Sept. 5, 2017) (noting plaintiff's Eighth Amendment claim could only survive summary judgment if he showed "that the diet was not safe or nutritionally adequate to sustain his health), *aff'd sub nom. Swinton v. Wright*, 776 F. App'x 721 (2d Cir. 2019). Nor does the evidence suggest that Plaintiff was exposed to a serious risk of harm due to a substantial food deprivation during his three days in the A & P Cell. Thus, no reasonable finder of fact could determine that Plaintiff was subjected to a constitutional deprivation of safe and nutritional food.

Even assuming that he sustained an objectively serious food deprivation, the record fails to support an inference that Defendants acted with deliberate indifference with respect to any food deprivation. The record shows Plaintiff had no contact with Defendants after his escort and did not inform them of his meal deprivation. Pl.'s Dep. at 21:11-:16. And, as DOC Lieutenants, Defendants had no role in preparing or delivering Plaintiff's meals. Defs.' L.R. at ¶ 60.

14

No reasonable jury reviewing the present record could conclude that either Lieutenants Bowers or Nichols acted in violation of the Eighth Amendment for failure to provide Plaintiff adequate and safe food. Accordingly, the Court must grant Defendants' motion for summary judgment as to Plaintiff's Eighth Amendment food deprivation claims.

### B.    Fourteenth Amendment Procedural Due Process Violation

Plaintiff maintains that Lieutenants Bowers and Nichols failed to afford him a hearing or notice prior to his placement in the A & P Cell in violation of his rights under the Fourteenth Amendment Procedural Due Process Clause. IRO at 7-8, 18; Compl. at ¶ 7 ("Defendants Bowers and Nichols placed plaintiff in a holding cell without any hearing or formal notification, so he could appeal the placement.").

Procedural due process requires that the government act "in a fair manner." *United States v. Salerno*, 481 U.S. 739, 746 (1987). The standard analysis for a claim of a violation of procedural due process "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (*per curiam*). For a prisoner, such a deprivation occurs when the prison "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. 472, 484 (1995).[12]  A court must examine the conditions of confinement "in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the

---

[12]  The Due Process Clause, standing alone, generally does not create a protected liberty interest in conditions of confinement as long as the conditions are "within the normal limits or range of custody which the conviction has authorized the State to impose." *Meachum v. Fano*, 427 U.S. 215, 225 (1976).

ordinary course of prison administration." *Welch v. Bartlett,* 196 F.3d 389, 392–93 (2d Cir. 1999); *Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000) (noting that the "duration and the frequency of such deprivations are highly relevant to whether the conditions of a plaintiff's confinement should be considered atypical").

If there is a liberty interest, the level of procedural protection required depends on the purpose of the confinement. *Bolden v. Alston*, 810 F.2d 353, 357 (2d Cir. 1987). When evaluating the processes used in prison disciplinary and administrative decision making, courts must be "mindful of the context," and remember "the deference we owe prison officials in carrying out their daily tasks." *Proctor v. LeClaire*, 846 F.3d 597, 608–09 (2d Cir. 2017) (citing *Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979)).

Plaintiff's transfer to the A & P Cell for a quarantine occurred during the global COVID-19 pandemic when prison officials faced a "dramatic challenge" to protect the prison population from a substantial risk of harm. *See Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 135 (2d Cir. 2020) (describing COVID-19 as a "dramatic challenge" and "recent emergency," the "impact" of which "on jail and prison inmates ... may be grave and enduring"). Thus, prison officials' COVID-19 mitigation efforts to control the spread of the COVID virus were entitled to substantial deference. *See Carolina v. Feder,* No. 3:20-CV-658 (SRU), 2021 WL 268854, at *8 (D. Conn. Jan. 26, 2021). The CRCC Testing Policy provided for inmates who refused COVID testing—such as Plaintiff—to be quarantined as part of mitigation efforts during the pandemic. *See* Testing Policy, ECF No. 47-9 (describing COVID-19 mitigation measures). Defendants have also submitted competent evidence that the A & P Cell was often used to

16

quarantine inmates during the pandemic. Defs.' L.R. at ¶ 18-19; *see* Nichols Decl. at ¶¶ 13, 15, 17, 19; Bowers Decl. at ¶¶ 8-9, 13, 15.

Plaintiff spent only three days in the A & P Cell after he refused testing. He complains that he did not have his belongings, telephone, recreation, or a mattress in the A & P Cell and was not served a soy diet during his three-day confinement. *See* Pl.'s Decl. at ¶ 11, ECF No. 58; Pl.'s Dep. at 3:7-:11; 8:3-:6; 13:15-:20; 14:18-:25. But the record reflects Plaintiff was nonetheless able to sleep and was offered meal trays—which he rejected without determining whether the tray included non-soy items—during that three-day period. *See id*. at 9:17-:24; 14:18-:25; 16:10-17:7; 19:1-:7. In *Sandin,* the Supreme Court determined that even a thirty-day confinement in the Restrictive Housing Unit was insufficient to show an "atypical and significant hardship" because "[t]he regime to which [the prisoner] was subjected ... was within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life." 515 U.S. at 484, 487.

No evidence supports an inference that Plaintiff's placement in the A & P Cell—separated from other inmates who were in quarantine after testing positive or were newly admitted—was not made as an effort to mitigate the spread of the COVID-19 virus while Plaintiff's infection status remained undetermined. *See* Defs.' L.R. at ¶ 20. And, Plaintiff has not shown that his short confinement in the A & P Cell as part of his quarantine under the Testing Policy gave rise to a liberty deprivation because of onerous conditions in relation to the "ordinary incidents of prison life" during the pandemic when it was necessary for inmates quarantine and for DOC to avoid inmate overcrowding.[13] *Sandin,* 515 U.S. at 484 (1995). Thus,

---

[13] According to his declaration, Plaintiff was subjected to a two-week confinement in a dirty cell in the A-Pod without showers, telephone calls, recreation, outside cell time, and sometimes no personal belongings

the record fails to support an inference that Plaintiff's three-day A & P Cell confinement gave rise to a liberty interest that entitled him to procedural due process protections. *See Pape v. Cook*, No. 3:20-CV-1324 (VAB), 2021 WL 2186427, at *12 (D. Conn. May 28, 2021) (fifteen-day quarantine conditions did not constitute an atypical or significant hardship that would warrant due process protection prior to his placement in the quarantine cell); *Culpepper v. Toulon*, No. 21-CV-6553(JS)(LGD), 2023 WL 6460887, at *4 (E.D.N.Y. Oct. 4, 2023) (dismissing inmate's procedural due process challenge to confinement in quarantine for 14 days without a hearing because "[n]o court has held that a hearing is required before an inmate is placed in medical quarantine."); *Milner v. Lamont*, No. 3:20-CV-1245 (JAM), 2022 WL 2110971, at *11 (D. Conn. June 9, 2022) ("No court has held that a hearing is required before an inmate is placed in medical quarantine.").

Alternatively, Defendants are shielded by the doctrine of qualified immunity, which shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Soto v. Gaudett*, 862 F.3d 148, 156 (2d Cir. 2017) (internal quotation marks and brackets omitted). A right is clearly established if, "at the time of the challenged conduct ... every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in

---

or electricity whenever he declined testing. *See* Pl.'s Decl. at ¶¶ 14-16, ECF No. 58. Inmate Nau—in a declaration submitted by Plaintiff—avers that he was also placed in the A & P Cell for quarantine purposes after testing positive for COVID-19. *See* Nau Decl. at ¶¶ 2-3, ECF No. 59 (averring to his fourteen days in A & P Cell after testing positive for COVID-19). Thus, Plaintiff's evidence reflects that an inmate's placement in the A & P Cell for quarantine during the COVID-19 pandemic was not atypical and that the A-Pod quarantine conditions were generally uncomfortable, although temporary.

deciding whether a right is clearly established." *Torcivia v. Suffolk Cty., New York*, No. 19-4167, 2021 WL 5183543, at *17 (2d Cir. Nov. 9, 2021) (quoting *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004)). Even when a right is clearly established, qualified immunity protects government officials when it was objectively reasonable for them to believe that their conduct in the particular factual context at issue did not violate that clearly established right. *See Manganiello v. City of New York,* 612 F.3d 149, 165 (2d Cir. 2010). "If a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability." *Ziglar v. Abbasi*, 528 U.S. 130, 152 (2017); *Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'); *Lennon v. Miller,* 66 F.3d 416, 421 (2d Cir. 1995) ("if the court determines that the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendants' conduct under the circumstances, summary judgment for the officers is appropriate."). But an officer's conduct is objectively unreasonable when no officer of reasonable competence could have made the same choice in similar circumstances. *Id.* at 420-21.

Defendants are entitled to qualified immunity even if they were involved with depriving Plaintiff of a liberty interest without due process.[14] Reasonable officers might not have known for certain under the circumstances presented by the COVID-19 pandemic that Plaintiff was entitled to procedural protection under the Fourteenth Amendment prior to his A & P Cell

---

[14] The Court notes that Defendants' involvement in the decision to place Plaintiff in the A & P Cell is not clear from the present record. Defendants each aver that they do not recall who made the decision to place Plaintiff in the A & P Cell on September 13, 2020. Nichols Decl. at ¶ 15; Bowers Decl. at ¶ 11. In his deposition, Plaintiff speculates that "it had to be" Defendants as "they were the supervisors that were there." 6:21-23.

placement for quarantine purposes after he refused COVID-19 testing. *See Ziglar,* 528 U.S. at 152. The Court grants the motion for summary judgment in Defendants' favor on Plaintiff's Fourteenth Amendment procedural due process claim.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the motion for summary judgment [ECF No. 47].

The clerk is instructed to enter judgment in Defendants' favor and to close this case.


_____/s/_____
Michael P. Shea
United States District Judge


**SO ORDERED** this 31st day of July 2025, at Hartford, Connecticut.